UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Christopher Beltran

  v.         Civil No. 04-cv-071-JD
              Opinion No. 2005 DNH 169
James O'Mara, Jr. et al.


O R D E R


  The defendants, who are the superintendent of the
Hillsborough County Department of Corrections, the Department
itself, and a number of its correctional officers, have moved to
dismiss this action arising out of the plaintiff's detention at
the Hillsborough County House of Corrections ("the HCHC") on the
ground that the plaintiff failed to exhaust his administrative
remedies as required by the Prison Litigation Reform Act, 42
U.S.C. § 1997e ("the PLRA").  Alternatively, the defendants have
moved for summary judgment on the grounds that the plaintiff
lacks evidence to support his claims and that they are entitled
to qualified immunity.  The plaintiff, Christopher Beltran, has
filed an objection to each motion.[1]

---

[1]Neither of Beltran's objections is accompanied by a
memorandum, and neither contains a statement explaining why a
memorandum is unnecessary.  Cf. L.R. 7.1(a)(2).  Because the
objections themselves contain argument and citations to
supporting authority, however, the court will treat the
objections as the memoranda required by the rule.

Standard of Review

Although the defendants have styled their request for dismissal under the PLRA as a motion to dismiss, the motion relies extensively on materials beyond Beltran's complaint and therefore must be treated as a motion for summary judgment.  See, e.g., Greene v. Rhode Island, 398 F.3d 45, 48-49 (1st Cir. 2005). Beltran's objection to the motion makes the same point, and he has submitted his own evidentiary materials in response. Accordingly, the motion to dismiss may be converted into a motion for summary judgment pursuant to Rule 12(b) without giving Beltran notice or any additional opportunity to respond.  McCord v. Horace Mann Ins. Co., 390 F.3d 138, 141 (1st Cir. 2004).

On a motion for summary judgment, the moving party has the burden of showing the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant carries this burden, the court must then determine whether the non-moving party has demonstrated a triable issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  The court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.  Id. at 255.

Background

Beltran's complaint sets forth three separate counts against one or more of the defendants.[2]  In Count II, Beltran alleges physical abuse at the hands of the individual officers named as defendants in violation of his rights to due process and against cruel and unusual punishment.  Count III claims that the superintendent of the Department and the Department itself have abrogated Beltran's right to due process through a pattern and practice of imposing unconstitutional conditions of confinement in the form of the HCHC's restricted housing unit ("the RHU").  Finally, Count V asserts that the superintendent and another defendant, named in the complaint as John Doe and further identified as the official "responsible for conducting reviews of plaintiff's placement within the jail," Compl. ¶ 74, violated Beltran's right to due process by failing to conduct meaningful reviews of his assignment to administrative segregation.[3]  The

---

[2]Beltran agrees that Count I of the complaint, seeking a temporary restraining order and preliminary injunction effecting his transfer to another facility, became moot upon his assignment to the New Hampshire State Prison on March 19, 2004, following his commencement of this action.  The complaint does not contain any Count IV.

[3]As set forth in the complaint, Count V appears to arise out of the allegedly punitive conditions in the RHU, as opposed to those in administrative segregation.  In his objection to the motion to dismiss, however, Beltran explains Count V as claiming that "he was denied due process by the jail's classification process, which designated [him] as in 'administrative segregation' and wrongly kept [him] . . . in harsh conditions

court will proceed to set forth the relevant background facts as they pertain to each of the counts, albeit in reverse order.

I.   Count V:  Beltran's Classification

Beltran entered the HCHC on July 23, 2003, while awaiting trial on two counts of second-degree murder.[4]  The next day, he was classified as a category 2, or "close" security, inmate, resulting in his placement in administrative segregation. According to the HCHC's inmate handbook, administrative segregation serves "the purpose of maintaining control, and safety" and entails one hour of exercise every third day, with telephone, commissary, and visitation privileges to be determined by the classification officer.  Obj. Mot. Dismiss, Ex. 1, at 7. The classification officer periodically reviews the status of inmates placed in administrative segregation.  In accordance with this policy, the classification committee held a hearing to review Beltran's status roughly every thirty days during his time at the HCHC.  Each time, the committee upheld his classification.

The classification notice issued to Beltran on July 24,

_____

that amounted to punishment without affording proper classification review."  Obj. Mot. Dismiss ¶ 13.  The court will therefore treat Beltran's classification claim as arising solely out of his placement in administrative segregation, as opposed to his time in disciplinary segregation.

[4]Beltran was also housed in the HCHC between June 4 and 5, 2003, at which point he was transferred to the New Hampshire State Prison.  He was later transferred back to the HCHC.

4

2003, stated that "[a]ny inmate who desires to do so may appeal his/her classification . . . within ten (10) days of the primary classification or reclassification by addressing the appeal to" the classification department.  Mem. Supp. Mots. Dismiss & Summ. J. Ex. D, at 1.  This process differs from the three-step "Grievance Procedure" outlined in the inmate handbook.  In fact, the handbook specifically provides that "[d]ecisions made by the . . . Classification Officer cannot be appealed through the grievance procedure."  Obj. Mot. Dismiss, Ex. 1, at 14.

The first step of the grievance procedure requires the inmate to "make a genuine attempt to seek an informal resolution of [his] problem with the staff member involved."  Id.  Should this attempt fail, the inmate can proceed to the second step, which "normally" entails the submission of an "Inmate Request Form" stating the problem and a suggested remedy.  Id.  The HCHC must answer the request within seven working days.  If the inmate is dissatisfied with the HCHC's response, he has forty-eight hours to file a grievance, the third step in the procedure.  The HCHC must respond to the grievance within fifteen working days.

Beltran did not appeal his classification at category 2 in the manner specified by the classification notice.  Instead, he submitted an "Inmate Request Form" stating, "I would like to know why I'm being punished when I haven't [done] [any]thing wrong.  I never got a write up or had any problem at the New Hampshire

State Prison.  There are people in population [here] that have the same charges."[5]  Obj. Mot. Dismiss, Ex. 5, at 1.  An HCHC official responded that Beltran had been classified based on the information garnered at his classification hearing and that, in any event, his classification would receive its periodic review on August 24, 2003.  Beltran did not file a grievance.

Beltran submitted another inmate request form on September 4, 2003, again questioning his placement in administrative segregation.  He also asked for a grievance form.  In response, an HCHC official wrote that "classification is not an issue that is recognized as grievable," but nevertheless provided the form, noting that "it [would] be given consideration" if filed.  Obj. Mot. Dismiss, Ex. 5, at 2.  Beltran never filed the grievance, but he did submit another request form on December 29, 2003, challenging his placement in administrative segregation.  An HCHC official simply wrote "Denied" in response to this request.  Id., at 3.  Again, Beltran did not file a grievance.

II.   Count III:  Conditions of Beltran's Confinement

Placement in disciplinary segregation, in contrast to administrative segregation, amounts to "a disciplinary sanction after a due process hearing for the purpose of maintaining

---

[5]Although the request is dated July 22, 2003, this appears to be an error, since Beltran had not yet been booked into the HCHC or classified as of that date.

control and safety . . . .  [I]nmates will not be entitled to commissary items and other privileges while in this classification." Obj. Mot. Dismiss, Ex. 1, at 6.  Furthermore, inmates in disciplinary segregation receive only one hour of recreation each day, "of which the first portion will be used for cell cleaning and personal hygiene." Id., at 18.  Beltran was first sent to the RHU on August 8, 2003, for a period of seven days, following the first of what would be many disciplinary hearings where he was found guilty of violations of HCHC rules.

Based on the portions of Beltran's disciplinary record submitted with the defendants' motion, and the statement in Beltran's objection to the motion to dismiss, Obj. Mot. Dismiss ¶ 23, the HCHC appears to have followed the same process in resolving all of the disciplinary charges against Beltran.  See also id., Ex. 1, at 18–19.  Specifically, at least twenty-four hours before each hearing, Beltran received a "Notice of Disciplinary Hearing" stating the charges against him.  In those instances where Beltran was found guilty, he received written notice of the decision and the resulting sanctions.  He then had the opportunity to appeal disciplinary findings to the superintendent by submitting a form included with the decision.

On December 1, 2003, Beltran was found guilty of two further violations of HCHC rules and given three more days in the RHU as a result.  Before he had served this time, however, Beltran was

found guilty of additional violations at another hearing the next day and sanctioned with additional time in the RHU as a result. He proceeded to spend the remainder of his time at the HCHC in the RHU as the result of a continuous series of guilty findings.

In his affidavit submitted in response to the defendants' motion for summary judgment, Beltran characterizes the conditions in the RHU as "inhuman."  Beltran Aff. ¶ 31.  During his approximately 110 days in disciplinary segregation between December 2003 and March 2004, Beltran filed four grievances complaining about the conditions there, three of them on December 14, 2003.[6]  One of the December 14 grievances stated,

> I am being punished for no reason.  I ha[ve] to suffer
> . . . long periods without eating anything [and] . . .
> threats and intimation [*sic*] by officer's [*sic*] and not
> being able to interact with other inmates . . . ."

Obj. Mot. Dismiss, Ex. 10, at 5.  In response, an HCHC official denied these charges and noted that Beltran had not "provided any names [or] specific times and dates of these accusations."  Id.

In another grievance filed on December 14, Beltran complained of "a number of times that I have to [wait] to use the restroom for over an hour," including a particular instance where he was deprived of toilet paper for about that long.  Obj. Mot. Dismiss, Ex. 10, at 4.  The third December 14 grievance alleged

---

[6]Beltran filed additional grievances during this time alleging threats and physical abuse by various correctional officers.  Those grievances are discussed infra at Part III.

that an officer named as a defendant in this action, Ryan
LaVierge,[7] would "always falsify documents to take 5 to 10 minutes
away from my [tier] time" and "go[] through at dinner 3 to 7
trays to find me one all messed up." Id., Ex. 6, at 3.  The
fourth grievance Beltran filed during his extended stint in the
RHU, dated January 13, 2004, complained that he was refused dry
clothing or linens for an entire night after his became soaked
when the sprinkler in his cell activated.  The HCHC did not grant
Beltran any relief as a result of these grievances.

In addition, Beltran filed a grievance on November 26, 2003,
concerning an event that occurred during an earlier stint in the
RHU.  The grievance claimed that an officer entered Beltran's
cell just before lights out and threatened to call for him to be
forcibly removed.  Although the officer eventually left without
further incident, Beltran alleged that he subsequently used his
toilet to flood his cell because he felt unsafe and wanted to
summon the sergeant on duty.  The HCHC shut off the water to
Beltran's cell as a result, although the summary judgment record
does not indicate for how long.[8]  In the grievance, filed the
next day, Beltran complains of "unsanitary conditions" and asked

---

[7]Although the parties' filings identify this defendant as
"Laverge," he spells his own name "LaVierge," as reflected in the
HCHC documents submitted with the defendants' motions.

[8]In their brief, the defendants describe this measure as a
"twenty-six hour water restriction."  Mem. Supp. Mots. Dismiss &
Summ. J. at 18.

for his water to be restored.  Obj. Mot. Dismiss, Ex. 10, at 3.
The grievance was rejected.

III. Count II:  Alleged Excessive Force

Beltran claims that, in retaliation for lodging these and
other complaints throughout the fall of 2003, the defendant
correctional officers physically abused him on a number of
occasions.[9]  Specifically, on November 26, 2003, Beltran
submitted a grievance complaining that an officer had "put a mop
on" him, allegedly in retaliation for filing previous grievances.
Obj. Mot. Dismiss, Ex. 2.  Beltran added that the retaliation was
worsening and asked for an explanation.  In response, an HCHC
official wrote:

> There was an incident report made out for this incident
> and this date.  A hearing was conducted . . . and you
> were found guilty.  You cannot appeal the results of
> this hearing through the Inmate Grievance Procedure.

Id. (emphasis added).

Beltran subsequently filed another grievance claiming that,
on January 4, 2004, officer Todd Gordon, named as a defendant in
this action, entered Beltran's cell after he had been handcuffed
and shackled.  Beltran attests that he was lying on the floor of
his cell when Gordon "started jerking [Beltran] by [his]
handcuffs and shackles creating [severe] pain."  Obj. Mot.

_____

[9]Beltran does not, however, assert any retaliation theory
independent of his excessive force claim.

Dismiss, Ex. 7.  According to Beltran, he was then accused of resisting and his shoulder was slammed "on the pads."  Id.  This grievance was denied with the explanation that Gordon and the other officers accompanying him had simply been checking Beltran's restraints and that they disagreed with his account.[10]

Beltran also alleges that, on January 5, 2004, unnamed HCHC personnel confiscated from him a pen and a highlighter he believed he was allowed to possess.  He responded by shaking the door to his cell to produce noise, which eventually summoned the sergeant on duty.  Beltran asked the sergeant to return the items; when he refused, Beltran cursed at him.  Beltran attests that "[i]n response, jail staff, on the authority and with the approval of" defendants Lieutenant Gerald Street and Lieutenant Brian Martineau, removed him from his cell and placed him in the restraint chair, "a hard plastic chair with heavy webbed straps designed for restraining inmates who are physically out of control and thus an immediate threat to themselves or others." Beltran Aff. ¶¶ 12-13.

Beltran remained in the chair for six and a half hours, although he claims that "[s]tandard practice is for inmates to be released from the chair about one hour after they calm down."

---

[10]Although disciplinary proceedings were initiated against Beltran in connection with the incident necessitating his restraint, there were apparently no charges brought as a result of this subsequent episode.

Id. ¶ 16.  Beltran claims that he "was never out of control and
[he] was calm" throughout his time in the restraint chair, though
the recorded observations of HCHC staff indicate otherwise.  Id.
¶ 17.  Beltran also alleges that, during this time, Gordon
regularly "bent [Beltran's] wrists for the sole purpose of
causing pain," which, together with the restraints themselves,
left him with "severe cuts and abrasions."  Id. ¶¶ 18–19.
Beltran recalls that Gordon also used Beltran's long hair to
tickle him, inducing squirming and humiliation.  Id. ¶ 18.
Gordon, for his part, claimed that Beltran tried to bite him
while he was checking one of the restraints.  A plastic mask was
consequently placed over Beltran's face at various intervals
during the balance of his time in the restraint chair.

In addition, a disciplinary charge was brought against
Beltran for attempted assault.  At the hearing, Beltran claimed
that Gordon had been tickling him with his own hair, which caused
him to move his head in a way Gordon interpreted as an attempt to
bite him.  Beltran was found guilty and sanctioned with
additional time in the RHU.  His appeal was denied.  In
contesting other disciplinary charges filed against him in
connection with the incident giving rise to his restraint in the
chair, Beltran alleged that Gordon twisted the restraints and
tickled Beltran with his hair and that the "straps on the chair
were so tight that [he] had marks 2 days later."  Obj. Mot.

12

Dismiss, Ex. 9, at 1.  Beltran was found guilty and received more time in the RHU; his appeal was denied.  Beltran did not file any inmate request forms or grievances in connection with the events of January 5, however.

Beltran attests that, on January 8, 2004, the sprinkler in his cell activated, resulting in "two to three inches of water" covering the floor.[11]  Beltran Aff. ¶ 8.  After the sprinkler had been turned off, Sergeant Thomas Dalton and officers Randy Murray and Michael Bernier, all of whom are named as defendants in this action, entered the cell.  Beltran recounts that they "handcuffed [his] hands behind [his] back, then simultaneously pulled [his] feet backward and pushed [his] head down face first in the water."  Id. ¶ 9.  After Beltran managed to raise his head, the officers slammed his face into the floor a second time.[12]  Beltran claims to have sustained "a large lump" on his head from this blow.  Id. ¶ 10. It does not appear that Beltran complained about this alleged assault through the grievance procedure.  At the subsequent disciplinary hearing, however, Beltran claimed to

_____

[11]Beltran's affidavit explains that, although his complaint alleged that this incident occurred on January 8, "[d]iscovery revealed that it actually occurred on January 4."  Beltran Aff. n. 1.  It turns out that Beltran was right the first time.  See Mem. Supp. Mots. Dismiss & Summ. J., Ex. F, Rept. 04-64, at 6, 8, 10, 12, 14.  For their part, the defendants incorrectly state that this incident occurred on January 14.

[12]In Murray's and Bernier's version of the incident, Beltran slipped on the wet floor of his cell while they were helping him to his feet.

13

have "been beaten up."  Mem. Supp. Mots. Dismiss & Summ. J., Ex.
F, Rept. 04-64, at 16.  Beltran was nevertheless found guilty of
the charges against him and sentenced to additional time in the
RHU; his appeal was denied.

Beltran was placed in the restraint chair again on six
different occasions in January 2004, each time for a period of
between two and four and a half hours.  As a result, he claims to
have suffered "severe and painful cuts and bruises to [his]
wrists and ankles, which took weeks to heal."  Beltran Aff. ¶ 23.
He attests that, in each of these instances, he did not engage in
the alleged misconduct resulting in his restraint or, if he did,
it "was so mild that it never caused other inmates to be put in
the chair," id. ¶ 21, but that Dalton and one of his co-
defendants, Sergeant Donna Lacerte, requested Beltran's placement
in the restraint chair with Street's and Martineau's approval.

Beltran did not file any inmate request slips or grievances
complaining about his time in the restraint chair.  In the
disciplinary proceedings arising out of the alleged conduct by
Beltran which resulted in his restraint, he claimed that his
placement in the chair was unjustified.  See Mem. Supp. Mots.
Dismiss & Summ. J., Ex. F, Rept. 04-150, at 13; Rept. 04-157, at
16; Rept. 04-166, at 15-16; Rept. 04-189, at 11-12; Rept. 04-226,
at 17-18.  He did not, however, allege any sadistic treatment
which accompanied his restraint, or any injury arising from it.

14

In each case, Beltran was found guilty of the misconduct precipitating his placement in the chair and sanctioned with additional time in the RHU.  Beltran appealed each of these determinations, except for the one based on the events leading to his restraint in the chair on January 29, 2004.  Compare id., Ex. F, Rept. 04-150, at 1-2; Rept. 04-157, at 1-2; Rept. 04-166, at 1-2; Rept. 04-189, at 1-2 with id., Ex. F, Rept. 04-226.

Finally, Beltran attests that Gordon, LaVierge, and Murray, together with their co-defendant Sergeant Scott Cunningham, beat him on February 8, 2004, while conducting a search of the RHU for a contraband metal object they believed to be harbored there. Beltran states that he assumed the proper position after the officers entered his cell, i.e., kneeling at the rear wall with his back to the door and his hands on the wall above his head. Beltran alleges that the officers nevertheless slammed his face into the wall twice, then threw him on the floor, where he was struck in the head repeatedly with an officers' knee and punched in the head at least once.  Beltran also claims that the officers twisted his foot "with such force that [he was] unable to walk on it for more than a week."  Beltran Aff. ¶ 26.  The officers left Beltran's cell without finding any contraband.  Beltran alleges that, after he asked for medical attention from an HCHC nurse, Cunningham threatened, "You better not tell her nothing."  Id.

At the subsequent disciplinary hearing, Beltran maintained

that he had been slammed into the wall and that LaVierge "kept on knee[ing] [him] in the head."  Obj. Mot. Dismiss, Ex. 9, at 2. He also said that "he was pulled off the wall and assaulted by" Gordon and LaVierge.  Mem. Supp. Mots. Dismiss & Summ. J., Ex. F, Rept. 04-378, at 24.  Nevertheless, the hearing officer found Beltran guilty, concluding that "[t]here were no medical reports or issues that the [sergeant] reported."  Id.  Beltran's appeal of the guilty finding and resulting sentence of additional time in the RHU was denied.  He did not register any complaint through the HCHC grievance procedure.  Beltran relates that, following the alleged assault of February 8, Gordon repeatedly threatened him, but Beltran did not file any grievances as a result.

<u>Discussion</u>

I.    <u>Whether Beltran Has Exhausted Administrative Remedies</u>

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under . . . any . . . Federal law, by a prisoner . . . until such administrative remedies as are available have been exhausted."  42 U.S.C. § 1997e(a).  The Supreme Court has held that this requirement "applies to all inmate suits about prison life, whether they involve general circumstances or a particular episode, and whether they allege excessive force or some other wrong."  <u>Porter v. Nussle</u>, 534 U.S. 516, 532 (2002).

16

Where section 1997e(a) applies, but the plaintiff has nevertheless failed to exhaust available administrative remedies prior to bringing suit, his or her claims must be dismissed without prejudice.  <u>Medina-Claudio v. Rodriguez-Mateo</u>, 292 F.3d 31, 36 (1st Cir. 2002).  The First Circuit follows the majority rule treating nonexhaustion as an affirmative defense, placing the burden on the defendant to prove that a plaintiff failed to exhaust available administrative remedies.  <u>Casanova v. Dubois</u>, 304 F.3d 75, 77 & n.3 (1st Cir. 2002); <u>Goodrich v. Rouleau</u>, 2003 DNH 48, 2003 WL 1392433, at *2 (D.N.H. Mar. 20, 2003).  Whether an inmate has done so presents a question of law, although the answer may depend on disputed factual issues.  <u>Snider v. Melindez</u>, 199 F.3d 108, 113 (2d Cir. 1999); <u>see also</u> <u>Mitchell v. Horn</u>, 318 F.3d 523, 529 (3d Cir. 2003).

The parties agree that all of Beltran's claims fall within the scope of the PLRA.  They disagree, however, on whether he fulfilled the requirements of section 1997e(a) prior to commencing this action.  Although Beltran acknowledges that he did not report all of the events that form the basis of this lawsuit through the inmate grievance procedure, he nevertheless argues that he "adequately exhausted some claims through grievances and appeals of disciplinary reports, and is excused from exhausting to the extent all of the claims were not precisely raised within the jail."  Obj. Mot. Dismiss ¶ 12.  The

defendants counter that "when a correctional facility's administrative process includes a procedure by which an inmate may file a grievance, there must be <u>strict</u> compliance with that procedure."  Reply Mem. at 2.  They also maintain that, even if Beltran failed to exhaust his administrative remedies as to only some of the claims in his complaint, the PLRA requires dismissal of the entire action as a result.  The court will first address whether Beltran administratively exhausted the claims set forth in each of the counts of his complaint before turning to whether his failure to exhaust some of those claims necessitates dismissal of his complaint as a whole.

A.   <u>Count V:  Beltran's Classification</u>

The classification notice Beltran received at the outset of his assignment to administrative segregation stated that he could appeal this determination to the classification department.  The notice also explained that an inmate could so appeal his classification "within ten (10) days of the primary classification or reclassification . . . ."  Mem. Supp. Mots. Dismiss & Summ. J. Ex. D, at 1.  Beltran's classification as a category 2 inmate was reviewed seven times following his initial classification at that level.  Each time, Beltran received notice that his classification had been upheld.  He never appealed any of these decisions to the classification department.

18

Beltran does not contend that this remedy was unavailable to him.  Instead, he points out that he filed a number of inmate request forms complaining about his placement in administrative segregation.  Given that the inmate handbook specifically provides that classification decisions cannot be appealed through the grievance procedure, however, Beltran's efforts in this regard do not amount to administrative exhaustion of his classification claim.  "To exhaust remedies, a prisoner must file complaints and appeals in the place . . . the prison's administrative rules require."  <u>Pozo v. McCaughtry</u>, 286 F.3d 1022, 1025 (7th Cir. 2002).

Even if the grievance procedure could be considered a substitute for an appeal to the classification officer, Beltran did not follow up on any of his inmate request slips with grievances as the procedure demands.  He therefore failed to exhaust even the remedy he incorrectly chose to pursue.  "An inmate who begins the grievance process but does not complete it is barred from pursuing a . . . claim under [the] PLRA for failure to exhaust his administrative remedies."  <u>Jernigan v. Stuchell</u>, 304 F.3d 1030, 1032 (10th Cir. 2002); <u>see also</u> <u>Wright v. Hollingsworth</u>, 260 F.3d 357, 358 (5th Cir. 2001).  Because Beltran failed to pursue the administrative remedies available to

him for his allegedly wrongful classification, the court must dismiss Count V of his complaint without prejudice.[13]

### B.   Count III:  Conditions of Beltran's Confinement

Beltran describes the allegedly punitive conditions of the RHU in both his complaint and his affidavit submitted in response to the summary judgment motion.  Specifically, he claims that his "use of water, soap, and toilet paper [was] unreasonably and arbitrarily limited and denied," that "the tier [was] rarely cleaned," that he was "subjected to an unreasonable number of strip searches and body cavity searches, sometimes eight or ten times a day," and that he was "confined to [his] cell for unreasonable and unjustified times, at most receiving one or two hours out of [his] cell, and sometimes remaining in [his] cell for 24 hours per day."  Beltran Aff. ¶¶ 31, 33-34; see also Compl. ¶¶ 51-53.  Beltran's complaint also accuses the defendants of tampering with his meals and legal mail.  Compl. ¶ 49.

---

[13]The court notes that, on December 10, 2003, Beltran filed two grievances that appear to complain about the classification process.  Mem. Supp. Mots. Dismiss & Summ. J. Ex. R, at 1, 4. Because Beltran's objections do not rely on these grievances, which have been submitted only as exhibits to the defendants' motions, the court has not considered them in determining whether Beltran exhausted his classification claim.  See, e.g., Tech. Planning Int'l, LLC v. Moore N. Am., Inc., 2003 DNH 85, 2003 WL 21228624, at *12 (D.N.H. May 23, 2003) (refusing to comb "voluminous record" on summary judgment for "hidden morsels supportive of [plaintiff's] claims" when plaintiff's own briefing failed to identify them).

In his objection to the defendants' motion to dismiss, Beltran relies on several grievances to attempt to show that he administratively exhausted his conditions of confinement claim.[14] One of these grievances registered a general complaint about punitive conditions, including deprivation of food and isolation from other inmates, but did not mention any of the deficiencies Beltran alleges here.  In other grievances filed that same day, Beltran complained of long waits to use the restroom and LaVierge's habitually depriving him of his allotted time outside his cell and serving him the least appetizing tray of food. Furthermore, in grievances filed at other times, Beltran complained of unsanitary conditions after his water had been shut off and of spending a night with wet clothing and linens after his sprinkler had activated.

To exhaust administrative remedies through a prison grievance process, "the grievant need not lay out the facts, articulate legal theories, or demand particular relief," unless prison rules consistent with the purposes of 42 U.S.C. § 1983 and the PLRA demand otherwise.  Strong v. David, 297 F.3d 646, 650 (7th Cir. 2002); see also Johnson v. Johnson, 385 F.3d 503, 516–17 (5th Cir. 2004) ("Johnson"); Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004) ("Testman"); Burton v. Jones, 321 F.3d 569, 575 (6th Cir. 2003).  Instead, "inmates must provide enough

---

[14]These grievances are discussed at Part II, supra.

information about the conduct of which they complain to allow

prison officials to take appropriate responsive measures."

Testman, 380 F.3d at 697; see also Johnson, 385 F.3d at 517;

Burton, 321 F.3d at 575; Strong, 297 F.3d at 650; accord Brown v.

Sikes, 212 F.3d 1205, 1207 (11th Cir. 2000) ("while § 1997e(a)

requires that a prisoner provide as much relevant information as

he reasonably can in the administrative grievance process, it

does not require that he do more than that").  As the Second

Circuit reasoned in Testman,

> Uncounselled inmates navigating prison administrative
> procedures without assistance cannot be expected to
> satisfy a standard more stringent than that of notice
> pleading [through their grievances].  Still, the PLRA's
> exhaustion requirement does require that prison
> officials be "afford[ed] . . . time and opportunity to
> address complaints internally."

380 F.3d at 697 (quoting Porter, 534 U.S. at 524-25).

The HCHC grievance procedure set forth in the inmate

handbook does not require that a grievance contain any particular

information.  Moreover, the instructions printed on the reverse

of the HCHC grievance form state, in relevant part, "Briefly

describe your grievance.  Include date and time.  Provide enough

information so that the recipient can understand your problem."

Mem. Supp. Mots. Dismiss & Summ. J., Ex. K, at 2.  This

instruction amounts to a rough approximation of the standard

courts have used when prison rules fail to specify the contents

of a grievance, i.e., the inmate must "object intelligibly to

some asserted shortcoming."   Strong, 297 F.3d at 650.

Despite this lenient standard, the court believes that Beltran largely failed to exhaust his conditions of confinement claim through the grievances he cites in his objection to the motion to dismiss.  Although one of the grievances alleged that Beltran was "being punished for no reason" and isolated from other inmates, Obj. Mot. Dismiss, Ex. 10, at 5, these charges were too vague to allow the HCHC to take any action, as noted in its response.  The grievances at issue do not give any indication that Beltran was charging that he was routinely deprived of soap, water, or time outside of his cell; that he was frequently subjected to searches; that the RHU was rarely cleaned; or that the defendants had tampered with his mail or food.[15]  They do, however, sufficiently set forth Beltran's claim that he was regularly denied toilet paper.

Beltran suggests that his grievances, when liberally construed and taken together, sufficed to put the defendants on notice of the conditions-of-confinement claim he asserts here.

---

[15]Although Beltran filed a number of inmate request slips complaining about loss of out-of-cell time, frequent searches, and the cleanliness of the facility, he does not rely on any of these materials in support of his argument that he exhausted his conditions of confinement claim.  See note 13, supra.  In any event, because Beltran never followed up on any of these request slips with grievances, he did not exhaust these complaints as required by the HCHC procedure.  See Part I.A, supra.

The court recognizes that the precise "extent to which the claims in suit must be similar to the exhausted grievances" under the PLRA has been called an "open question." Sedney v. Hasse, 2003 WL 21939702, at *4 (S.D.N.Y. Aug. 12, 2003) (citing cases). As just discussed, however, to satisfy the purposes of section 1997e(a), an inmate's administrative filings must enable prison officials to resolve the alleged problem before it becomes the subject of litigation as well as to allow "the creation of an 'administrative record that clarifies the contours of the controversy'" to be later decided in court. Johnson, 385 F.3d at 518 n.9 (quoting Porter, 534 U.S. at 525).

Even when read in the manner Beltran suggests, the grievances he filed over conditions in the RHU fall short of this standard. Beltran's accusations that LaVierge regularly cut short his out-of-cell time by five or ten minutes and served him dinner trays that were "all messed up" are considerably narrower, and less serious, than the claims in Beltran's complaint that he was "confined to his cell for unreasonable and unjustified times . . . sometimes remaining in his cell for 24 hours per day," Compl. ¶ 53, or that unnamed "jail staff" would regularly tamper with his food, including by spitting in it. Id. ¶ 49. Beltran's grievance over the alleged threat that scared him into flooding his cell, resulting in the temporary suspension of water service,

bears only a tenuous connection to the allegation in his complaint that his use of water was "unreasonably and arbitrarily limited and denied."  Id. ¶ 51.

In the court's view, the fit between these grievances and Beltran's conditions of confinement claim is too loose to support a determination that he has administratively exhausted it, except to the extent the claim arises out of the alleged deprivation of toilet paper.[16]  See, e.g., Turner v. Goord, 376 F. Supp. 2d 321, 325 (W.D.N.Y. 2005) (ruling that grievance over "nothing more than one discrete instance of maltreatment" did not exhaust inmate's claim alleging systemic problem); Hoffenberg v. Fed. Bureau of Prisons, 2004 WL 2203479, at *12–*13 (D. Mass. Sept. 14, 2004) (citing cases); Nichols v. Logan, 355 F. Supp. 2d 1155, 1163 (S.D. Cal. 2004); Curry v. Fischer, 2004 WL 766433, at *7–*8 (S.D.N.Y. Apr. 12, 2004); cf. Lewis v. Washington, 197 F.R.D. 611, 614 (N.D. Ill. 2000).  Furthermore, despite Beltran's suggestion to the contrary, the fact that he effectively grieved one of the allegedly unconstitutional conditions of his confinement does not mean that he has administratively exhausted his claim that other conditions were also unconstitutional, or,

---

[16]In addition, the court agrees with the defendants that Beltran's grievance over having to spend one night in wet clothes appears to bear no relationship at all to the unconstitutional conditions of confinement alleged in the complaint.

for that matter, that the conditions as a whole were.  <u>See</u>, <u>e.g.</u>,
<u>Degrafinreid v. Hicks</u>, 2004 WL 2793168, at *13 (S.D.N.Y. Dec. 6,
2004) (ruling that inmate's grievance referring to missing
hearing aids did not exhaust numerous other alleged violations of
Americans with Disabilities Act); <u>accord</u> <u>Johnson</u>, 385 F.3d at 518
n.9 (recognizing that Eight Amendment and equal protection claims
both arising out of alleged failure to protect inmate were
"related," but concluding that they "reflect distinct problems
with prison staff" and that grieving one therefore could not
suffice to exhaust the other).

     Beltran failed to exhaust available administrative remedies
as to his claim that the HCHC imposed unconstitutional conditions
of confinement, except insofar as it arises out of the alleged
deprivation of toilet paper.  With that exception, count III of
his complaint is therefore dismissed without prejudice.


          C.   <u>Count II:  Alleged Excessive Force</u>

     As previously noted, the First Circuit treats an inmate's
failure to exhaust administrative remedies under the PLRA as an
affirmative defense.  <u>Casanova</u>, 304 F.3d at 77 & n.3.
Accordingly, the defense "'may be subject to certain defenses
such as waiver, estoppel, or equitable tolling.'"  <u>Id.</u> at 78
(quoting <u>Wendell v. Asher</u>, 162 F.3d 887, 890 (5th Cir. 1998)).

Defendants may become estopped from asserting an inmate's failure
to exhaust as a defense under the PLRA, then, by interfering with
an inmate's efforts to pursue administrative remedies.  See
Ziemba v. Wezner, 366 F.3d 161, 163 (2d Cir. 2004); Lyon v. Vande
Krol, 305 F.3d 806, 808 (8th Cir. 2002); Jernigan, 304 F.3d at
1033 (dicta); Lewis v. Washington, 300 F.3d 829, 834–85 (7th Cir.
2002) (dicta).

     Relatedly, because the PLRA requires exhaustion of only
those administrative remedies "as are available" as a
prerequisite to bringing suit, courts have held that "a remedy
that prison officials prevent a prisoner from utilizing is not an
available remedy under § 1997e(a) . . ."  Miller v. Norris, 247
F.3d 736, 740 (8th Cir. 2001) (internal quotation marks and
bracketing omitted); see also Abney v. McGinnis, 380 F.3d 663,
667 (2d Cir. 2004); Dale v. Lappin, 376 F.3d 652, 656 (7th Cir.
2004); Mitchell, 318 F.3d at 529.  Beltran invokes these
limitations on the exhaustion requirement by arguing that he
should be deemed to have exhausted his administrative remedies as
to his excessive force claim through the attendant disciplinary
proceedings, even though he failed to file grievances over the
incidents, because he was told that he could not appeal those
proceedings through the grievance process.

     As discussed in Part III, supra, Beltran submitted a

grievance on November 26, 2003, making a general allegation of
retaliation against him for filing grievances as embodied by a
particular incident with a particular guard.  This incident had
resulted in a disciplinary charge against Beltran and a hearing
where he was found guilty.  Thus, in response to Beltran's
grievance, an HCHC official simply reminded Beltran of this
history and stated,  "You cannot appeal the results of this
hearing through the Inmate Grievance Procedure."  Obj. Mot.
Dismiss, Ex. 2.

Beltran suggests that this response dissuaded him from
filing grievances over subsequent incidents that gave rise to
disciplinary proceedings.  Similar arguments have found favor in
a number of courts.  Indeed, "[p]rison officials may 'prevent' a
prisoner from utilizing a remedy by incorrectly representing to
the prisoner that his complaint is not grievable, or that it is
grievable only through another avenue."  Jeffers v. Goord, 2005
WL 928628, at *6 (N.D.N.Y. Apr. 4, 2005) (collecting cases); see
also, e.g., Westefer v. Snyder, 422 F.3d 570, 579-80 (7th Cir.
2005) (reversing dismissal of prisoners' claims challenging
transfers to maximum-security facility based on failure to
exhaust where officials took inconsistent positions on whether
transfers could be grieved); Brown v. Croak, 312 F.3d 109, 111-13
(3d Cir. 2002) (reversing dismissal of prisoner's action based on

failure to file grievance where prison officials told him he could not file until completion of investigation but never informed him that investigation had been completed).

Beltran's argument is similar to the one that convinced the Second Circuit in Giano v. Goord, 380 F.3d 670 (2d Cir. 2004). There, a prison directive described "the individual decisions or dispositions of . . . disciplinary proceedings" as non-grievable. Id. at 678.  As a result, the inmate did not file a grievance asserting the claim he subsequently brought in court, i.e., that the defendants presented false evidence against him at disciplinary hearings in retaliation for a previous lawsuit against prison officials.  Id. at 674.  The inmate did, however, challenge the allegedly false evidence at the hearings themselves, and appealed the subsequent guilty finding on the same basis.  Id. at 673-74.  In light of the language of the directive, the Second Circuit concluded that "it was reasonable for [the inmate] to think that direct appeal of his disciplinary conviction was his only available remedy.  Accordingly, . . . his failure to exhaust was justified."  Id. at 679.

As Giano suggests, and as the Second Circuit expressly held in an opinion issued simultaneously in a consolidated appeal, "[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one:  that is,

would a similarly situated individual of ordinary firmness have deemed them available." Hemphill v. New York, 380 F.3d 680, 688 (2d Cir. 2004) (internal quotation marks omitted).  Here, when Beltran filed a grievance claiming harassment in retaliation for his previous complaints, an HCHC official rejected the grievance because the particular incident of harassment alleged had also been the subject of disciplinary proceedings.  In the court's view, this statement would have led a reasonable inmate in Beltran's position to believe that the grievance process was not an available means of complaining about incidents that had given rise to disciplinary proceedings.

Like the plaintiff in Giano, a reasonable inmate would have also believed that he could therefore use the disciplinary process itself as a forum for grieving such incidents.[17]  As with any other grievance about prison life, see Part I.B, supra, a complaint lodged as part of the disciplinary process must sufficiently "'alert [] the prison to the nature of the wrong for which redress is sought'" to fulfill the PLRA's exhaustion requirement.  Testman, 380 F.3d at 697 (2d Cir. 2004) (quoting Strong, 297 F.3d at 650); see also Braham v. Clancy, 425 F.3d

---

[17]Indeed, Beltran regularly defended himself against disciplinary charges arising out of a particular incident by claiming that some wrongful behavior on the part of the officers had precipitated it.

177, 184 (2d Cir. 2005).  Under this standard, Beltran exhausted most of his excessive force claim during the disciplinary proceedings against him.

In support of his excessive force claim, Beltran alleges, inter alia, that certain of the defendant officers assaulted him on January 4, 2004, January 8, 2004, and February 8, 2004. Beltran did file a grievance as to the alleged January 4 assault, which did not generate any disciplinary charges.  Each of the other two episodes led to the initiation of disciplinary proceedings at which Beltran alleged that he had been subjected to excessive force.  The records of those proceedings indicate that he sufficiently notified the HCHC of his claims so as to satisfy section 1997e(a).  See Part III, supra.

Beltran also alleged that he was placed in the restraint chair on January 5, 2005, and on six different occasions between January 20, 2005, and January 29, 2005.  He claims that this treatment violated his constitutional rights because he was restrained "maliciously and sadistically for the very purpose of inflicting harm," Compl. ¶ 61, and that he suffered both physical and emotional injury as a result.  The incident culminating in Beltran's first trip to the restraint chair, on January 5, spawned disciplinary proceedings against him, as did Beltran's alleged attempt to bite Gordon while restrained.  As the records

31

of those proceedings reflect, Beltran claimed that the "straps on the chair were so tight that I had marks 2 days later" and that Gordon "twist[ed] the restraints and tickled me with my hair." Obj. Mot. Dismiss, Ex. 9, at 1; see also id., Ex. 8, at 7, 8.

Each subsequent episode resulting in Beltran's placement in the restraint chair also generated disciplinary proceedings where Beltran argued that his behavior did not justify his restraint. These complaints therefore sufficed to put the defendants on notice of Beltran's claim that the defendants placed him in the restraint chair maliciously and sadistically, rather than for legitimate purposes, on each of the instances he cites in support of his excessive force claim.

These circumstances distinguish this case from Hopkins v. Coplan, 2005 DNH 38, 2005 WL 615746 (D.N.H. Mar. 16, 2005), a decision by another judge of this court on which the defendants rely for the proposition that "[a]n inmate may not utilize different measures to voice his concerns but must instead use the specific forms and procedures provided . . . substantial compliance in the form of alternative endeavors to apprize the institution of his complaints, does not suffice." Reply Mem. at 2. The inmate in Hopkins argued that his appeal of a disciplinary finding against him for engaging in a fight, which he characterized as an assault, sufficed to exhaust his claims

32

that the defendants had been deliberately indifferent to both his safety before the assault and his medical needs afterward.  2005 WL 615746, at *2-*3.  Because the appeal "deal[t] only with some of the general circumstances surrounding the assault" and "focuse[d] primarily on the alleged procedural deficiencies in the disciplinary hearing . . . ," the court concluded that it could not substitute for the grievance procedure as a means of exhaustion.  Id. at *3.

Here, in contrast, the records of the relevant disciplinary hearings show that Beltran made claims then which are at least similar to those he makes now.  Moreover, unlike the inmate in Hopkins, Beltran was specifically told that he could not file a grievance over an incident which had also given rise to disciplinary proceedings.  Hopkins, then, does not support the defendants' argument that Beltran could not have exhausted his excessive force claim through the complaints he registered as part of the disciplinary process.

The defendants further argue that Beltran "did not partake in the disciplinary appeal process or otherwise attack the disciplinary proceedings with regards [sic] to use of the restraint chair . . . ."  Reply Mem. at 7.  As a result, they argue that Beltran failed to exhaust those claims because he did not see the available administrative process through to its

completion.  See Part I.A, supra.  This argument seriously

misrepresents the summary judgment record.[18]  As discussed in

Part III, supra, the records of Beltran's disciplinary

proceedings show that he appealed all but one of the guilty

findings entered in connection with an episode leading to his

placement in the chair.  The court therefore concludes that

Beltran administratively exhausted his excessive force claim to

the extent it arises out of his trips to the restraint chair,

except for the trip that occurred on January 29, 2004.

Beltran did not exhaust his excessive force claim, however,

insofar as it arises out of the allegedly threatening behavior of

Gordon and other unidentified officers.  Beltran charges that

this behavior started after Gordon and other officers allegedly

assaulted him on February 8, 2004, but he did not file any

grievances complaining of Gordon's behavior after that date.

Although Beltran did file grievances during December, 2003, and

early January, 2004, claiming threats by Gordon and other

officers, those grievances could not have served to notify the

defendants of Beltran's claim in this action, which proceeds from

---

[18]The defendants make the same argument with regard to
Beltran's complaints of assault raised through the disciplinary
process.  Reply Mem. at 7.  The argument is similarly unfounded,
because Beltran appealed both of the guilty findings entered in
connection with the alleged assaults.  See Part III, supra.

the subsequent threats alleged in the complaint.  "A grievance obviously cannot exhaust administrative remedies for claims based on events that have not yet occurred."  <u>Ross v. County of Bernalillo</u>, 365 F.3d 1181, 1187 (10th Cir. 2004); <u>see also Johnson</u>, 385 F.3d at 521 n.12.

      D.   <u>Whether Beltran's Failure to Exhaust Some Claims Mandates Dismissal of His Entire Complaint</u>

The defendants argue that Beltran's failure to exhaust some of the claims in his complaint requires dismissal of the entire action.  Three circuits have interpreted section 1997e(a) to impose this "total exhaustion" requirement.  <u>Bey v. Johnson</u>, 407 F.3d 801, 807 (6th Cir. 2005); <u>Ross</u>, 365 F.3d at 1187; <u>Graves v. Norris</u>, 218 F.3d 884, 885 (8th Cir. 2000) (per curiam).  Two other circuits, however, have expressly rejected such a rule.[19] <u>Lira v. Herrera</u>, 427 F.3d 1164, 1170-71 (9th Cir. 2005); <u>Ortiz v. McBride</u>, 380 F.3d 649, 663 (2d Cir. 2004), <u>cert. denied</u>, 125 S. Ct. 1398 (2005).  Neither the First Circuit nor this court has passed on the "total exhaustion" question.[20]  <u>But see Goodrich</u>,

---

[19]The Seventh Circuit has noted the split of authority on this issue but has declined to take it up.  <u>Cannon v. Washington</u>, 418 F.3d 714, 719 (7th Cir. 2005).

[20]Another district court within the First Circuit has issued two apparently contradictory opinions on whether section 1997e(a) requires total exhaustion.  <u>Compare</u> <u>Stevens v. Plaistead</u>, 2005 WL

2003 DNH 48, 2003 WL 1392433, at *2 (allowing prisoner's exhausted claims to proceed despite failure to exhaust other claims but not discussing total exhaustion approach).

Without acknowledging this split of authority, the defendants argue that the total exhaustion rule is supported by the plain language of section 1997e(a), the policies underlying the PLRA, and concerns of judicial economy. The court disagrees, essentially for the reasons stated by those circuits which have rejected such a rule.

Under section 1997(e)(a), "[n]o <u>action</u> shall be brought with respect to prison conditions . . . until such administrative remedies as are available are exhausted" (emphasis added). Section 1997e(c), in turn, provides that:

> (1) The court shall on its own motion or the motion of a party dismiss any action brought . . . if the court is satisfied that the action is frivolous, malicious, fails to state a claim on which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.
>
> (2) In the event that a claim is, on its face, frivolous, malicious, fails to state a claim on which

---

2122099, at *4 n.2 (D. Me. Aug. 31, 2005) (noting that court was "highly skeptical" of total exhaustion rule), <u>rep. & recomm. adopted</u>, 2005 WL 2709636 (D. Me. Oct. 21, 2005), <u>with</u> <u>Donovan v. Magnusson</u>, 2005 WL 1572598, at *2 (D. Me. June 7, 2004) (accepting total exhaustion approach), <u>rep. & recomm. adopted</u>, 2005 WL 1770158 (D. Me. Aug. 4, 2005). The issue does not appear to have been considered in any of the other districts in the circuit.

> relief can be granted, or seeks monetary relief from a
> defendant who is immune from such relief, the court may
> dismiss the underlying claim without first requiring
> the exhaustion of administrative remedies.

Two of the circuits that have adopted the total exhaustion

approach have reasoned that the "use of the word 'claims' in

subsection (c)(2) indicates that 'claims' are individual

allegations and 'actions' are entire lawsuits," so that the use

of the term "action" in subsection (a) requires dismissal of the

entire action absent exhaustion of available administrative

remedies as to <u>any</u> claim.  <u>Bey</u>, 407 F.3d at 807 (citing <u>Ross</u>, 365

F.3d at 1190).[21]

    As Judge Clay observed in his partially dissenting opinion

in <u>Bey</u>, however, reading "action" in this manner "renders

subsection (c)(2) superfluous . . . if subsection (c)(1) requires

dismissal of an action for frivolousness, then subsection

(c)(2)'s reference to dismissal of frivolous claims would be

entirely unnecessary."  407 F.3d at 811; <u>see also</u> <u>Lira</u>, 427 F.3d

at 1172.  Subsection (c) casts further doubt on the extraction of

a total exhaustion rule from subsection (a) because, while

subsection (c)(1) expressly requires the dismissal of an action

---

    [21]The Eighth Circuit in <u>Graves</u> simply "concluded, without
explanation, that the language of the statute requires such
dismissal."  <u>Ortiz</u>, 380 F.3d at 656 n.3 (citing <u>Graves</u>, 218 F.3d
at 885).

suffering from any of the enumerated deficiencies, subsection (a) "by contrast, provides no such explicit instruction about how courts should respond to actions containing unexhausted claims that have been impermissibly 'brought' in violation of that section." Ortiz, 380 F.3d at 657 n.6; see also Lira, 427 F.3d at 1171.  Read properly, then, the language of section 1997e(a) does not support the total exhaustion rule.  Lira, 427 F.3d at 1173; Ortiz, 380 F.3d at 656–57.

The defendants also argue that the total exhaustion approach furthers the purposes of the PLRA, specifically, "reduc[ing] the number of prisoner suits" and "giv[ing] increased powers to the correctional facilities such that they could resolve their issues according to their own internal dispute resolution systems." Mem. Supp. Mots. Dismiss & Summ. J. at 11.  As this case illustrates, however, the total exhaustion rule would in many instances serve only to multiply prisoner litigation.  Because Beltran has partially exhausted two of the three claims he has asserted in his complaint, he would in all likelihood simply file a subsequent action pressing only the exhausted claims were the court to dismiss his present complaint in its entirety under the total exhaustion rule.  "Such a requirement would promote the precise inefficiency the PLRA was designed to avoid––requiring courts to docket, assign and process two cases where one would

do."  <u>Lira</u>, 427 F.3d at 1174 (footnote omitted); <u>see also</u> <u>Ortiz</u>, 380 F.3d at 659.

In fact, although the Eighth Circuit nominally follows the total exhaustion rule, it has held that an inmate facing dismissal of his entire action as a consequence should ordinarily be given leave to amend his complaint to drop any nonexhausted claims so that only exhausted claims remain.  <u>See</u> <u>Kozohorsky v. Harmon</u>, 332 F.3d 1141, 1144 (8th Cir. 2003).  The court sees little difference between that tack and the simple dismissal of the nonexhausted claims without prejudice, which, of course, would be the result <u>without</u> the total exhaustion rule.

In addition, the total exhaustion approach could further proliferate prisoner suits by encouraging the filing of a separate action asserting each claim as it became exhausted. <u>Lira</u>, 427 F.3d at 1174; <u>Ortiz</u>, 380 F.3d at 658.  In disagreeing with this point, the Sixth Circuit in <u>Bey</u> identified additional incentives that discourage this kind of claim-splitting, among them the PLRA's own "three strikes" provision, 28 U.S.C. § 1915(g), and the requirement of an additional filing fee for each separate action.  407 F.3d at 808-809.  This court agrees with Judge Clay, however, that this "suggestion that prisoners engage in a conscious cost-benefit analysis or 'choice' of when to bring exhausted claims" does not comport with the demonstrated

realities of prisoner litigation, id. at 814, particularly the
propensity of inmates to seek (and often obtain) leave to proceed
in forma pauperis notwithstanding the limitations on that option
imposed by other provisions of the PLRA.  In short, prisoners who
believe their rights have been violated are likely to resort to
the judicial process as soon as the law allows.  They are
unlikely to wait until they have accrued enough exhausted claims
to ensure only the most economical filing.

The court also disagrees with the defendants' argument that
the total exhaustion rule serves the PLRA's goal of fostering
resolution of inmate complaints at the institutional level any
better than the contrary approach would.  As the Ninth Circuit
has observed, and this case demonstrates, a suit by a single
inmate often raises a number of claims bearing little
relationship to each other.  Lira, 427 F.3d at 1174.  In such a
case, refusing to hear the exhausted claims until the
nonexhausted ones have gone through the administrative process
does no more "to satisfy the plaintiff, weed out frivolous
complaints, or develop an administrative record" than dismissing
only the nonexhausted claims would.  Id.; but see Bey, 407 F.3d
at 807 (asserting without further analysis that total exhaustion
would facilitate development of "complete 'administrative record
that would ultimately assist federal courts in addressing the

prisoner's claims'" (quoting <u>Ross</u>, 365 F.3d at 1190)).  It is

unlikely that the defendants here, for example, would reconsider

their views on the merits of Beltran's excessive force claim,

insofar as it has already been exhausted, while hearing any

grievances he may elect to file on his conditions of confinement

or classification claims.  Accordingly, no further administrative

development of the exhausted claims is likely to occur as a

result of dismissing them along with the nonexhausted ones.

        Finally, the court believes that the total exhaustion rule

would unnecessarily tax judicial resources, despite the

defendants' argument.  In the words of the Second Circuit,

> prisoners' actions may present questions as to whether
> one or more claims have been exhausted that are not
> only genuine, but difficult for courts to decide.  In
> any such action, the district court must first
> familiarize itself with the case and hear the positions
> of the parties in order to decide the exhaustion issue
> as a preliminary matter.  It hardly seems to aid
> efficiency to require that, if the court decides the
> claim-exhaustion issue against the prisoner, it must
> then dismiss any remaining exhausted claims only to
> allow the same case, absent the unexhausted claims, to
> be reinstituted, heard again on the exhausted issues,
> and then decided.

<u>Ortiz</u>, 380 F.3d at 659 (citations omitted).  Again, this case

serves as a near-perfect example.  Addressing the defendants'

argument that Beltran did not exhaust his claims he asserts here

has required the court to ascertain the bases for those claims

and compare them to the many grievances which he did file and the

numerous disciplinary proceedings which occurred.  Now that the
court has thus familiarized itself with this matter, dismissing
Beltran's exhausted claims would require the court to duplicate
much of that effort in reacquainting itself with those claims
should Beltran elect to refile them after exhaustion.  The court
fails to see how this approach would promote judicial economy,
and the circuit court decisions adopting the total exhaustion
rule do not persuasively reason to the contrary.  See Bey, 407
F.3d at 809 (noting that total exhaustion "'would relieve
district courts of the duty to determine whether certain
exhausted claims are severable from other unexhausted claims that
they are required to dismiss,'" but not addressing problem of
duplicative effort necessitated by refiling of exhausted claims
(quoting Ross, 365 F.3d at 1190)).

     For these reasons, as more fully explained in Ortiz and
Lira, the court declines to apply the total exhaustion rule.  The
court's conclusion that Beltran has failed to exhaust some of the
claims asserted in his complaint, then, does not give rise to the
dismissal of his action as a whole.[22]

---

     [22]In Lira, the Ninth Circuit held that when an inmate's
"complaint includes exhausted and unexhausted claims that are
closely related and difficult to untangle, dismissal of the
defective complaint with leave to amend to allege only fully
exhausted claims, is the proper approach."  427 F.3d at 1176.
The defendants here do not argue for such a result, and, in any

II.   <u>The Defendants' Motion for Summary Judgment</u>

In addition to moving to dismiss based on Beltran's asserted failure to exhaust administrative remedies, the defendants seek summary judgment on the grounds that (1) "as a matter of law, [his] excessive force claim cannot be sustained," Mem. Supp. Mots. Dismiss & Summ. J. at 15, (2) the conditions of Beltran's confinement did not rise to the level of a constitutional violation, and (3) the defendants are entitled to qualified immunity for all of their complained-of actions.[23]   The court will address these arguments in turn.

A.   <u>The Excessive Force Claim</u>

Because Beltran was a pretrial detainee, not a convicted prisoner, during the events at issue here, he was protected under the Fourteenth Amendment's guarantee of due process, rather than the Eight Amendment's prohibition against cruel and unusual

event, the court does not believe it is appropriate in this case. This court therefore expresses no opinion on the soundness of <u>Lira</u>'s holding in this regard.

[23]Although the defendants also seek summary judgment against other claims on additional grounds, those arguments are moot in light of the dismissal of those claims based on Beltran's failure to exhaust them.  For this reason, and because the court grants the motion for summary judgment on Beltran's exhausted conditions of confinement claim, <u>see</u> Part II.B, <u>infra</u>, O'Mara's additional argument for summary judgment in his favor is also moot.

punishment.  E.g., Surprenant v. Rivas, 424 F.3d 5, 18 (1st Cir.

2005); Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002)

(citing Bell v. Wolfish, 441 U.S. 520, 545 (1979)).  The Due

Process clause protects a pretrial detainee from the use of

excessive force that amounts to punishment.  Graham v. Connor,

490 U.S. 386, 395 n.10 (1989).  As the First Circuit has held,

> "In determining whether [this] constitutional line has
> been crossed, a court must look to such factors as the
> need for the application of force, the relationship
> between the need and the amount of force that was used,
> the extent of injury inflicted, and whether force was
> applied in a good faith effort to maintain or restore
> discipline or maliciously or sadistically for the very
> purpose of causing harm."

Cummings v. McIntire, 271 F.3d 341, 346 (quoting Johnson v.

Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)); accord Hudson v.

McMillian, 503 U.S. 1, 7 (1992) (laying out similar factors to

consider in analyzing Eighth Amendment claim).

     The defendants do not address these factors in either their

primary or reply brief in support of the summary judgment motion.

Instead, characterizing Beltran's physical abuse claim as "that

on one occasion he was lifted by his handcuffs and shackled [*sic*]

and had his shoulder slammed," Mem. Supp. Mots. Dismiss & Summ.

J. at 15, they argue that this incident amounts to "'*one de

minimis* [sic] use of physical force . . . shielded from

constitutional scrutinty [*sic*]. . . .'"  Id. (quoting LaFauci v.

<u>N.H. Dep't of Corrs.</u>, 2005 DNH 29, 2005 WL 419691, at *12 (D.N.H. Feb. 23, 2005)) (further internal quotation marks omitted).[24] Beltran's complaint, however, claims multiple instances of excessive force apart from the January 4, 2004, incident on which the defendants base their argument, including alleged assaults on January 8 and February 8 and a number of trips to the restraint chair.  <u>See</u> Part III, <u>supra</u>.

In his affidavit, Beltran recounts each of the alleged assaults (including that of January 4) in some detail, maintaining that the defendants' actions on those occasions exceeded what was necessary to restrain him and caused him injuries.  Furthermore, Beltran states that he was placed in the restraint chair either for no reason, or for reasons that would not have earned other inmates a trip there, and that he was left in the restraint chair for periods longer than those imposed on other inmates.  The affidavit therefore suffices to create a genuine issue of fact as to whether the defendants used excessive force in violation of the Fourteenth Amendment.  The motion for summary judgment on Beltran's excessive force claim is denied.

---

[24]Although the defendants use "sic" in quoting <u>LaFauci</u>, apparently to indicate that "de minimis" is misspelled there, <u>LaFauci</u> actually uses the correct spelling of that term.  <u>See</u> <u>Black's Law Dictionary</u> 464 (8th ed. 2004).

B.    The Conditions of Confinement Claim

As a result of Beltran's failure to exhaust administrative remedies, his claim that the defendants subjected him to unconstitutional conditions of confinement is limited to his claim that he was regularly denied toilet paper so as to delay his efforts to use the restroom.  See Part I.B, supra.  To prove that the conditions of his confinement violated the Fourteenth Amendment, an inmate must show, inter alia, "that, from an objective standpoint, [they] deny him the minimal measure of necessities required for civilized living."  Surprenant, 424 F.3d at 18 (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)).  The defendants argue that Beltran's allegedly restricted access to toilet paper does not satisfy this standard.

The court agrees.  Although Beltran alleges that his use of toilet paper was "unreasonably and arbitrarily limited and denied," Compl. ¶ 31, the only material in the summary judgment record supporting this statement consists of a grievance complaining that he was regularly made to wait over an hour for that item.  In light of the relatively short duration of these delays, and the absence of any evidence as to their frequency, they do not in of themselves amount to a constitutional violation.  Cf. Surprenant, 424 F.3d at 19-20 (finding no plain error in plaintiff's verdict on Fourteenth Amendment claim based

on withholding of toilet paper and all other personal hygiene
items, restriction of water use to guards' discretion, and five
strip searches each day, for more than three weeks); see also
Harris v. Fleming, 839 F.2d 1232, 1235-36 (7th Cir. 1988)
(upholding entry of summary judgment against Eighth Amendment
claim based on deprivation of toilet paper for four days and
other personal hygiene items for longer periods).  The
defendants' motion for summary judgment on the exhausted portion
of Beltran's conditions of confinement claim is granted.

        C.   Qualified Immunity

        Finally, the defendants seek summary judgment on all of
Beltran's claims on the basis of qualified immunity.  Given the
disposition of Beltran's classification and conditions of
confinement claims supra, this contention is moot except as to
his claim for excessive force.  As to this claim, the defendants
state, as the entirety of their argument, "the inquiry is whether
an inmate has a clearly established constitutional right . . .
[t]o be free from any force during one incident of being
restrained . . .  The answer[] . . . [is] clearly 'no.'"  Mem.
Supp. Mots. Dismiss & Summ. J. at 26.  Not only does this
argument rest on a blatant mischaracterization of Beltran's
excessive force claim, see Part II.A, supra, but it is also

47

insufficiently developed to merit the court's analysis.  <u>See</u>
<u>Higgins v. New Balance Athletic Shoe, Inc.</u>, 194 F.3d 252, 260
(1st Cir. 1999).  The defendants' motion for summary judgment on
Beltran's excessive force claim is therefore denied.


<u>Conclusion</u>

For the foregoing reasons, the defendants' motion to dismiss
Beltran's claims without prejudice for failure to exhaust
administrative remedies (document no. 19) is granted as to Count
V in its entirety; as to Count IV except insofar as it arises out
of the alleged withholding of toilet paper from Beltran; and as
to Count II insofar as it arises out of Beltran's placement in
the restraint chair on January 29, 2004.  The motion is otherwise
denied.  The defendants' motion for summary judgment (document
no. 18) is granted as to Count IV insofar as it arises out of the
alleged withholding of toilet paper from Beltran but denied as to
Count II.  The motion is otherwise denied as moot.

SO ORDERED.


_____
Joseph A. DiClerico, Jr.
United States District Judge


December 20, 2005
cc:  John A. Curran, Esquire
     Elizabeth L. Hurley, Esquire
     Michael J. Sheehan, Esquire